## BURTIS v. COOK & SARGENT *et al.*

1. JUDGMENT ASSIGNABLE: EQUITIES. A judgment is a chose in action, and is assignable, but the assignee takes it charged with all the equities which could be asserted against it in the hands of the assignor.

*Appeal from Scott District Court.*

TUESDAY, APRIL 26.

THE transactions out of which this suit arose, may be briefly stated as follows: Burtis, the plaintiff, had, at different times, nogotiated loans of money of the defendants, Cook & Sargent, bankers, amounting in the aggregate to some $20,000, more or less. To secure the same, Burtis conveyed to George B. Sargent, one of the defendants, by deed absolute in form, nearly six thousand acres of land, situated in this State. This conveyance was intended to be a mortgage or deed of trust, as shown by a written defeasance or agreement, contemporaneously executed be-

tween the parties. Under this agreement, Sargent had the power to sell said lands, and apply the proceeds thereof in liquidation of said indebtedness.

The price, however, for which he was to sell said lands, was to be designated by Burtis, who subsequently fixed it at $3.50 per acre. But, in the agreement spoken of, it was stipulated " that all the lands sold by said Sargent should be accounted for to said Burtis, at the price for which they are sold; and in no case should said Sargent sell any of said lands at a less price than he should be instructed to sell by Burtis, for and during the next twelve months. On the 13th of April, 1860, the defendants, Cook & Sargent, presented to plaintiff a statement of the account, bearing date March the 5th, 1860, as they claimed that it existed between them, putting down the aggregate amount of the indebtedness at $28,910.54, and crediting plaintiff with $21,000, being the price of 6,000 acres of land at $3.50 per acre, leaving a balance due thereon of $7,910.54. Among the items of indebtedness rendered, was the confession of a mechanic's lien judgment in favor of one Phineas Mervin, for the sum of $5,998.35, which on the 25th of November, 1859, had been assigned to the said Cook & Sargent.

As to many of the other items of the account, the charge of usury is preferred, and it is claimed by the plaintiff that after purging the same, the amount legally due from him on the 5th of March, 1860, would not exceed the sum of $25,056.43, including the judgment aforesaid. He, moreover, claims that Cook & Sargent had disposed of said lands by a sale thereof, realizing therefrom more than enough to cover the entire indebtedness of the plaintiff to them, and that they refuse to render a specific accounting therefor; that after the said Cook & Sargent had received a full satisfaction of their claim against plaintiff by a sale of the land aforesaid, including the Mervin judgment, and after they had rendered their account as aforesaid, to wit, on the

18th day of May, 1860, they assigned the Mervin judgment to one John O. Sargent, for the purpose of defrauding plaintiff, and that the said John O. Sargent had caused an execution to issue, under which the sheriff was about to sell the plaintiff's real estate; to restrain which an injunction is asked, and a prayer for a final accounting between the parties.

The defendants, in their answer, after denying most of the allegations in the plaintiff's petition, claim, that on the 5th day of March, 1860, they made a new contract with plaintiff whereby they became the absolute owners by purchase, of said lands, at $3.50 per acre, after which they transferred them, with other lands, to the Washington Bank, in payment of their own indebtedness to said bank, at $2.50 per acre. They further claim, that the Mervin judgment was assigned to John O. Sargent for value, with no notice to him of any defense against it, and before any payment of the same had been made by plaintiff; all which the plaintiff's replication denied. At the trial, certain special issues of fact were submitted to the jury, in substance as follows:

1st. Was the contract of August 20th, 1858, in force when Sargent sold the lands of Burtis to the Washington Bank, and were the lands sold under and by virtue of said contract? The fact involved in this submission was found in the affirmative.

2d. Did Cook & Sargent make any new contract with Burtis, to buy the lands themselves, at $3.50 per acre? which the jury found in the negative.

3d. What sum, in the aggregate, did Cook & Sargent realize from the plaintiff's lands? Answer, $35,340.00.

4th. At what price per acre did Sargeant sell the Burtis' lands in the various counties? Answer, In Iowa and Jasper, at $8.00 per acre; in Carroll and Guthrie, at $5.00 per acre; in Pottawatamie, at $6.50 per acre.

Burtis v. Cook & Sargent.

Under these findings, the Court modifying Nos. 3 and 4, held, that Cook & Sargent had received $25,069 for Burtis' lands, and also at the time of said sale, that there was due Cook & Sargent from Burtis, $25,056.43, including the Mervin judgment, leaving a balance of $12,57 due Burtis; that after the sale of the lands, before the assignment of the judgment to John O. Sargent; Cook & Sargent treated the proceeds of the land as being applicable to the payment of said judgment as well as the other indebtedness to them, and that Burtis has the right, as against all the defendants, to have the proceeds of said lands applied to the satisfaction of said judgment; and accordingly ordered a cancellation of said judgment and notes, and that the defendants be forever enjoined from the collection of the same. It was also ordered that the plaintiff recover from Cook & Sargent $12,57, and from John O. Sargent, the costs, &c., the defendants appeal.

*Grant & Smith* for the appellant, cited *Davis* v. *Milburn,* 3 Iowa, 170, as directly in point; and as sustaining the same, *Makepeace* v. *Coates,* 8 Mass., 454; *Murray* v. *Lylburn,* 2 Johns. Ch., 442; *Green* v. *Darling,* 5 Mason, 214; *Howe* v. *Sheppard,* 2 Tenn., 411; *Livingston* v. *Dean,* 2 Johns. Ch., 479; *Simmons* v. *Williams,* 27 Ala., 507; *Johnson* v. *Bridge,* 6 Cow., 693; *Hopper* v. *Spicer,* 2 Swan. (Tenn.), 494; *Garland* v. *Harrison,* 17 Mo., 28; *Linsley* v. *Beal,* 2 Ga., 134; *Bullard* v. *Dorsey,* 9 S. & M., 9; *Hawks* v. *Sands,* 3 Gilm., 227; *Schemerhorn* v. *Anderson,* 2 Barb., 584; *Clark* v. *Soker,* 11 Mo., 97.

*Davison & True* for the appellee, cited *Lee* v. *Hughes,* 3 A. K. Marsh, 39; *Allen* v. *Culver,* 3 Denio, 284; *Beebe* v. *The Bank of New York,* 1 John., 530; *Covell* v. *The Tradesmen's Bank,* 1 Paige Ch., 131; *Webster* v. *Wise,* Id., 319; *Utica Insurance Company* v. *Power,* 11 Paige, 365; *Gay* v.

*Gay*, Id., 369; *Merrill* v. *Souther*, 6 Dana, 305; *Anislee* v. *Boynton*, 2 Barb., 258; *Bush* v. *Lathrop*, 22 N. Y., 535; 13 Ill., 41, 486.

LOWE, J. — The nature of this controversy, and the result of its determination below, is presented in the statement of the case; in the retrial thereof here, our first inquiry will be as to plaintiff's indebtedness to Cook & Sargent, including the Mervin judgment. The whole amount, after purging the claim of its usury, was by the court below fixed at $25,056.43. The correctness of this finding is not seriously controverted, except that it is claimed by the defendants that the Mervin judgment is an indebtedness to John O. Sargent, instead of the firm of Cook & Sargent. The usury which infected the indebtedness as alleged in the petition, is confessed, and after re-examining the account, and going over the figures and calculations in connection with the evidence bearing upon the same, we have been unable to detect any material error in the amount thus ascertained and fixed upon; as to the Mervin judgment and the equities relating thereto, we will hereafter speak. Whether this amount has been paid by Burtis is a question of more difficulty. Cook & Sargent have received from him, and as a payment on said debt the avails of six thousand acres of land, but out of this circumstance grow two or three seriously controverted points:

First. Whether they took this land of the plaintiff at a specified price per acre as purchasers under him?

Second. If not, then in disposing of the land by sale as the authorized agents of the plaintiff, what did they obtain for the same?

And lastly, if they conveyed the land in payment of their own debts, and received an advance price for the same, because of their reputed insolvency, can the plaintiff insist upon the benefit of such advanced price on settlement?

As respects this last point we refrain from the expression of any opinion, for the reason that this feature of the defense is only made in argument, and not set up or alluded to in the answers of the defendants, and more especially, because if it was conceded that equity would deny the plaintiff the right to claim the advance price under the circumstances stated, nevertheless no basis is laid or data given by the evidence in the case, whereby it is possible for us to determine the point in the value of the lands, above and beyond which a higher price was allowed. No allegation of the kind is made in the pleadings. No equitable claim of the sort is or can be predicated of the evidence, it comes simply by way of suggestion on the argument of counsel. The truth is, the theory of the defense is mainly based upon the point first above suggested, namely, that the plaintiff had on or about the 5th of March, 1860, contracted to sell and did sell, these lands to Cook & Sargent at $3.50 per acre, at which price they were willing to account to him. Now this purchase of the lands is distinctly charged by way of defense in the answer of the defendants, and it devolves upon them affirmatively to establish the same by proof. This they did by the direct testimony of John P. Cook, but which was as positively disproved by the testimony of J. J. Burtis. There were circumstances corroborating each of these witnesses, with no preponderance, however, in favor of the defense. In this equipoise of the evidence, the contested point was submitted to the determination of a jury, who found the same in favor of the plaintiff, which finding was afterward affirmed by the Court. There is nothing in evidence impeaching either of these witnesses. It is a clear case of misunderstanding, and we are to suppose that each honestly testified to the transaction as he understood it. Without analyzing upon paper the facts and circumstances corroborative of the testimony of each, for the purpose of

showing our estimate of it, and the grounds of our decision, we propose stating simply, that after reviewing all the evidence bearing upon this point, we have been unable to reach the conclusion that the court and jury below erred in their settlement of this branch of the defense, and will leave it where they did, unsustained by a preponderance of the evidence.

The question, however, still remains, what did Sargent, the agent and trustee, in disposing of these lands, get for the same? It is conceded that he sold them to the Washington Bank of Boston, in part payment of a debt due from Cook & Sargent to that institution.

In the present attitude of the records and pleadings in the case, and in view of the express terms of the contract creating the trust, to the effect "that all lands sold by said Sargent should be accounted for to said Burtis at the price for which they are, or may be sold," we suppose whatever credit Cook & Sargent obtained from said bank, on their indebtedness, in consideration of a sale of those lands to it, the same credit should be allowed on Burtis' indebtedness to them. This would only be effectuating the terms of the contract in force between the parties at the time the lands were sold to the bank. But just what this amount or credit should be, is not rendered clear, explicit, or even satisfactory by the evidence. We can only arrive at it approximately by calculation, founded upon certain figures and data furnished by the witnesses. For instance, it appears from the facts disclosed, that Cook & Sargent's indebtedness to the bank aforesaid, was $93,975, that they proposed, through Sargent, the acting agent, to sell in liquidation of this debt, 12,483 acres of land, at a certain price per acre therein specified, which, in the aggregate, would amount to that sum. Among these were the Burtis lands, which, with 40 acres subsequently added, amounted in round numbers, to 6,000 acres, and were offered by Sargent at $34,891.

The residue of the 12,483 acres were the lands of Cook & Sargent, these were offered at some $59,084, more or less. The proposition thus made was declined by the bank, but they did consent and agree to credit Cook & Sargent, in consideration thereof, with $67,242, which was finally accepted. This made a gross reduction in the price of the lands of some $26,749, or about $2.14 per acre. Now, Sargent, in his original proposition of settlement with the bank, offered some of the Burtis lands at $8.00, others at $6.50, and others again at $5.00 per acre, so that the average price at which they were put in when thus received, was about $4.17 or $4.18 per acre, and in consideration of which, Cook & Sargent obtained a credit on their account with the bank of some $25,065, more or less. It is conceded that this estimate or calculation is, to some extent, conjectural, yet with the data before us, we could think of no other method of arriving with greater accuracy at the facts of the case. Its uncertainty consists mainly in the circumstance, that before the negotiation was fully completed between the parties, some of the Cook & Sargent lands embraced in the first offer, were exchanged for city property in Des Moines, which property is claimed to have been put in at $9,000; what effect, if any, this should have upon our calculation based upon the gross reduction at which the lands were put in, it is impossible to say. We believe, however, from the light we have, that the conclusion arrived at in the court below, as to the amount which Cook & Sargent realized from the Burtis lands, is as near the truth of the matter as can well be attained.

Assuming, therefore, the debt and credit to be as thus found, it follows that Burtis' liabilities to Cook & Sargent are all extinguished, including the Mervin judgment, unless the latter is protected from the equities of Burtis, in favor of John O. Sargent, who claims to be the owner thereof by assignment, for value, and without notice of

such equities. Granting that the assignment was taken in the manner stated, it nevertheless becomes a very grave question, whether in law or equity he is entitled to protection, especially under the circumstances of this case. Let us see what there are. In August, 1858, Burtis conveys his lands aforesaid to George B. Sargent, in trust, to secure his indebtedness to Cook & Sargent, with authority to sell not below a minimum price, fixed by Burtis, and to account for the same at the price for which they may be sold. In November, 1859, Cook & Sargent became the owners, by assignment, of the Mervin judgment. On the 24th of March, 1860, they (Cook & Sargent), sold the Burtis lands at figures covering said judgment and all other indebtedness. On the 13th of April following, they rendered their account to Burtis, which set forth the items of their claim against him, among which was the full amount of this judgment; and crediting him with the proceeds of the land at $3.50 per acre. After this, namely, on the 18th day of May, 1860, this judgment was assigned to John O. Sargent, who claims to be an innocent purchaser, without notice. But all the authorities agree, that a judgment is a mere chose in action; and whilst it is assignable, it does not, in its negotiation, occupy the place of unmatured negotiable paper, in which the assignee is allowed to claim a greater interest than was possessed by the assignor. This is exceptional, and results from motives of policy, to promote the interests of commerce and trade, in giving the requisite currency to their paper. Not so, however, with judgments or unnegotiable paper, in the transfer of which, the assignee takes the exact position of his vendor, who, neither in law or logic, is capable of imparting to the assignee any greater interest than he himself possessed at the time of the transfer; and thus, in obedience to the principles of natural justice, as the case at bar very well illustrates. Fifty or more days before John O. Sar-

gent obtained an assignment of this judgment, it had been fully paid to Cook & Sargent. The fact that they did not apply the payment or the proceeds of his land thereto, by entering satisfaction of record, does not alter the rights of Burtis. Cook & Sargent could not have enforced this judgment against Burtis whilst they had in their hands the avails of his lands, to the full amount thereof, as a set-off. If they attempted it, a court of equity would compel the allowance of the set-off, and enjoin the execution. Now, John O. Sargent, their assignee, whether with or without notice, occupies no better position than they did, for this class of choses in action are not entitled to the protection of commercial paper.

By the express provisions of the statute, § 1796 of the Revision of 1860, all instruments in writing, for the payment of money or property, without words of negotiability, are assignable; and it further provides, that the assignee shall take them " *subject to any defense or set-off, legal or equitable, which the maker or debtor had against any assignor thereof, before notice of his assignment.*" Now, no question is made of the non-assignability of judgments, they are like the above instruments, choses in action, and as they do not contain words of negotiability, it follows that the same rules must govern their transfer as those of unnegotiable paper. This provision of the Code, coupled with the law of set-offs, which is made very broad under the statutes of this State, show the legislative intent, that if a judgment debtor or maker of one of these instruments has a set-off or equity, that equity should not be to him a barren right, or an exile to our courts of justice. Indeed, we have recently had occasion to recognize and settle this principle in the case of *Hurst* v. *Sheets & Trussell*, 14 Iowa, 322, which was a bill in equity to compel a set-off of mutual judgments after one of them had been assigned, and we again repeat the remark then suggested as having been made by

Lord MANSFIELD, that "natural equity, says that cross-demands should compensate each other, by deducting the less sum from the greater, and that the difference is the only sum which can be justly due."

This doctrine of equities and set-offs is abundantly supported by authorities, a few of which are here referred to. *Green* v. *Hatch*, 12 Mass. R., 195; *Bank of Niagara* v. *Mc-Cracken*, 18 Johns. R., 493; *Ford* v. *Stewart*, 19 Johns., 342; *McJilton* v. *Love*, 13 Ill., 486: *Covel* v. *Tradesman's Bank*, 1 Paige Ch., 130; *Webster* v. *Wair*, 1 Paige Ch., 319; *Utica Insurance Co.* v. *Power*, 10 Paige, 365; *Gay* v. *Gay*, 10 Paige, 367; *Merrill* v. *Souther*, 6 Dana (Ky.), 305; *Ainslee* v. *Boynton*, 2 Barb., 258; *Bush* v. *Lathrop*, 22 N. Y. (8 Smith), 535; *Chamberlain* v. *Day*, 3 Cow., 353; 6 B. Monr., 119. Some of these are exceedingly pertinent to the case at bar. Take the following cases, *McJilton* v. *Love*, 13 Ill., *supra*, where it was held that a judgment could not be transferred so as to vest the legal interest in the assignee. It is a mere chose in action, and the beneficial interest only passes by the assignment, the assignee takes it, subject to all the defenses that existed against it, in the hands of the party from whom he received it. In *Merrill* v. *Souther*, 6 Dana, 305, it was held, that, when cross-demands exist, and one of the parties is insolvent, the other has an equitable right of set-off which cannot be divested by an assignment of the demand against him. A court of equity has jurisdiction to decree a set-off, when either of the parties are insolvent or non-resident, notwithstanding the demands are in the form of judgments.

The supposed distinction between latent equities, as they are sometimes termed, and those existing between the original parties to the instrument was very well examined and discussed by Judge DENIO, in the case of *Bush, Adm.*, v. *Lathrop*, 22 Barb., 535. The facts were these: Noble, the plaintiff's intestate, was the owner of a mortgage of

$1,400, originally executed by one Addis to one Cole. He assigned the same as collateral security for the payment of $268, which he owed to one Preston, who agreed to return the same on the payment of the debt thus secured. The assignment was written on the back of the mortgage, and expressed a consideration of $268; and it contained a covenant, that $1,400 was due on the same; in other respects, it was absolute in its terms. Noble died in November following, and Preston, in January after that, assigned the mortgage to Smith & Warren, who assigned it to the defendant, Lathrop, for the full value of its face paid. The plaintiff soon thereafter learning what had been done with the mortgage, immediately tendered to the defendant the amount of the principal and interest due on his intestate's note, and demanded a reassignment of the mortgage, which was refused. Upon the subject of the *bona fides* of the several assignments, there was nothing to impeach the same, unless the smallness of the consideration expressed in the assignment from Noble to Preston did so.

In this state of case, the legal conclusion of the Court was, that the plaintiff had a redeemable title to the mortgage, and could demand a reassignment of the same. This decision not only recognizes and ascertains the general doctrine, that the assignee of a chose in action takes it subject to all equities existing at the time in favor of the debtor against the assignee, but goes further, and holds that the equities existing between an assignor and an assignee of an unnegotiable instrument, attend the title transferred to a subsequent assignee for value, and without notice. It fully indorses Lord THURLOW's rule, that a purchaser of such a security must always abide by the case of the person from whom he buys.

It also very satisfactorily answers one of the defendants' objections to the plaintiff's equity in this case, to the effect

that it was only available between the original parties to the judgment, and did not accompany the judgment when it passed into the hands of a subsequent assignee; and his counsel cited some authorities, tending to support this principle, a few of which Judge DENIO reviews, and insisted that they never obtained sufficient root in the jurisprudence of New York to be followed as judicial precedents.

Our remarks upon this case have already become too much extended to notice by name, or in detail, the various authorities relied upon by the defense. We do not think, however, that they shake the rule or principle under discussion, as laid down in the later decisions to which we have referred.

The case of *Davis et al.* v. *Milburn*, 3 Iowa, 170; 8 Mass., 454; 2 Johns. Ch., 442; 5 Mason, 214; 2 Sumn., 411, and others, are cited to sustain the defendants' view of this case; but they most all turned, and were decided upon other questions. It is true some of them contained *dicta* proving the defendant's side of the case, but these ought not to prevail over adjudications, made directly upon the question in dispute.

Upon the whole, our conclusion is, that the judgment below should be

Affirmed.